# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| KYLE BURKE, Individually and On Behalf of All Others Similarly Situated, | x<br>: | |
| | : | No. 06-CV-5029 (CBA) (MDG) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| AFFILIATED COMPUTER SERVICES, INC., THE ACS ADMINISTRATIVE COMMITTEE, LORA VILLARREAL, KELLAR NEVILL, GLADYS MITCHELL, MEG CINO, MIKE MILLER, JOHN CRYSLER, VAN JOHNSON, SCOTT BELL, ANNE MELI, DAVID LOTOCKI, RANDALL BOOTH, PAM TRUTNA, BRETT JAKOVAC, JEFFREY A. RICH, MARK A. KING,  DARWIN DEASON, JOSEPH P. O'NEILL,  and J. LIVINGSTON KOSBERG, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| Defendants. | :<br>: | |

_____ x

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Kyle Burke, individually and on behalf of all other persons similarly situated  (the "Participants"), and on behalf of the ACS Savings Plan (the "Plan"), by his attorneys, alleges the following for his Amended Class Action Complaint (the "Complaint"):

### NATURE OF THE ACTION

1.      Plaintiff, who was a Participant in the Plan during time periods relevant to this Complaint, brings this civil enforcement action under Section 502 (a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C §1132(a), for plan-wide relief on behalf of a class of all Participants in the Plan for whose individual accounts the Plan held shares of Affiliated Computer Services, Inc. common stock (hereinafter referred to as "ACS" or the "Company") as part of the

1

ACS Stock Fund investment option in the Plan (the "Class") at any time between December 31, 1998 and the present,(the "Class Period"). Defendants are the named and *de facto* fiduciaries of the Plan, who are deemed "fiduciaries" under the broad definition of fiduciary under section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). Plaintiff brings this action on behalf of the Plan and the Class pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. §11132(a)(2) and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor ("DOL") Regulations, 29 C.F.R. 2550. Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify the investments in the Plan so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in ACS common stock when it was imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), Plaintiff seeks other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, and other monetary relief. Insofar as any Defendant is sued alternatively as a knowing

participant in a breach of fiduciary duty for equitable relief, Plaintiff intends to proceed pursuant to § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)).

3.      Plaintiff alleges that Defendants breached their fiduciary duties by negligently misrepresenting and negligently failing to disclose material information necessary for Participants to make informed decisions concerning Plan assets and benefits and the appropriateness of the Plan investment in ACS stock, including, but not limited to, the backdating of stock option grants to Defendants Jeffrey A. Rich and Mark A. King, the related concealment of the Company's true financial and operating condition, the concealment of serious problems relating to the Company's senior management integrity and competence, and serious questions relating to legal and regulatory compliance which recently led to, among other things, an investigation by the Justice Department, the SEC and United States Attorneys for the Eastern and Southern Districts of New York into inappropriate practices relating to executive stock options grants by many companies, including ACS.

4.      When the Company's problems relating to the backdating of stock option grants to certain of the Company's senior executives were disclosed in part near the end of the Class Period, the trading price of ACS common stock declined precipitously, including a decline of approximately $5 per share, or 10%, when the Wall Street Journal reported on ACS executive stock option irregularities on April 28, 2006, and the Participants' retirement savings in the Plan, to the extent that such retirement savings consisted of ACS common stock in the form of the ACS Stock Fund, have been significantly diminished.

## **JURISDICTION AND VENUE**

5.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

6.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.§ 1132(e)(1).

7.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. 1132(e)(2), because this is the district where the Plan is administered, where the breaches took place and where one or more Defendants reside or may be found.  Venue is also proper in this District because the United States Attorney for the Eastern District of New York has requested documents from, and is investigating, many companies for allegedly inappropriate practice relating to executive stock options grants.

**PARTIES**

8.     Plaintiff Kyle Burke is a resident of the State of Maryland. Plaintiff Burke is a participant in the Plan and continues to hold ACS common stock in his individual account under the Plan.  Plaintiff Kyle Burke has suffered loss in his individual account under the Plan in connection with his holding of units of the ACS Stock Fund.

9.     Defendant ACS is a Delaware corporation with its principal place of business at 2028 North Haskell Avenue, Dallas, Texas  75204.  ACS is a Fortune 500 and S&P 500 company with approximately 52,000 employees which is the business of providing business process and information technology outsourcing solutions to commercial and government clients.  Among other things, the Company operates the E-Z Pass programs in New York and New Jersey, the largest electronic toll collection programs in the world.  In addition, the Company's largest contract is with the United States Department of Education, which contract involves loan servicing, loan processing, debt collection and portfolio management services.

10.     ACS was a fiduciary of the Plan because it was the sponsor of the Plan;  because it was a "named fiduciary" under the governing Plan document; because it "maintained" and was the Administrator of the Plan under the governing Plan document[1], and because it disseminated to

---

[1]  The governing Plan document throughout most of the Class Period was the ACS Savings Plan (Amended and Restated effective July 1, 2004), which has been produced to Plaintiff in this action and designated ACS 00298 *et seq.*  Article 2.2 of the governing Plan document states that "[t]he Employer shall be the Administrator."  Article 1.38 of the governing Plan document

Participants Summary Plan Descriptions (individually and collectively, "SPDs")[2].  Fiduciaries of

the Plan are required under ERISA to furnish certain information to Participants.  For example,

ERISA §101, 29 U.S.C. § 1021, requires the Plan's Administrator to furnish to Participants the SPD.

ERISA §102, 29 U.S.C. §1022, provides that the SPD must apprise Participants of their rights and

obligations under the Plan.  The SPD and all information contained or incorporated therein

constitute representations in a fiduciary capacity upon which Participants are entitled to rely in

determining the identity and responsibilities of fiduciaries under the Plan and in making decisions

concerning their benefits and investment and management of the Plan's assets allocated to their

accounts.  Indeed, the Summary Plan Descriptions transmitted to Participants by and on behalf of

ACS during the Class Period specifically encouraged Participants to review the Company's SEC

filings in making their investment allocation decisions under the Plan.  For example, the SPD for

July 1, 2004 (ACS 00895) states in part:

---

defines "Named Fiduciary" as the "Employer" and as the "Administrator."  "Employer" is
defined as Affiliated Computer Services, Inc. and its successors and predecessors in the
maintenance of the Plan (Article 1.19).  The governing Plan document also defines
"Administrator" to "mean [t]he Employer unless another person or entity has been designated
..."  As discussed herein, the Affiliated Computer Services, Inc. Administrative Committee
Charter (ACS 00576 *et seq*.) provides that the Company has designated the ACS Administrative
Committee as another named fiduciary of the Plan.

[2]      For example, Section 2.3(j) of the governing Plan document provides in relevant part:
"[T]he primary responsibility of the Administrator [ACS] is to administer the Plan for the
exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms
of the Plan ... the Administrator shall be charged with the duties of the general
administration of the Plan, including, but not limited to, the following:

                                          ***

(j)  to act as the Named Fiduciary responsible for communications with
Participants as needed to maintain Plan compliance with ERISA Section 404(c),
including but not limited to the receipt and transmitting of Participant's directions
as to the investment of their account(s) under the Plan and the formulation of
policies, rules, and procedures pursuant to which Participants may give
investment instructions with respect to the investment of their accounts.
(ACS 00319) (Emphasis added).

The Company files periodic reports and proxy materials with the Securities and Exchange Commission ("SEC") which contain information regarding the Company's business, financial condition and management.  You should review the Company's SEC filings and the information provided below in making a decision whether to direct the Plan trustees to invest your Plan account in Common Stock. (emphasis added.)

11.　　ACS is also liable, under principles of agency and respondeat superior, for the breaches of fiduciary duty of the Individual Defendants (as defined in this Complaint).  The governing Plan document makes clear that when ACS acted as a Plan fiduciary, it acted through the actions of the Individual Defendants (ACS 00366)[3].  Similarly, the Individual Defendants (as defined herein) were acting on behalf of the Company when they executed Plan amendments and other records in relation to the Plan.  For example, the February 6, 2006 amendment to the Plan relating to the merger of the 401(k) Plan of Ascom Transport Systems, Inc. into the Plan was executed as follows:

**IN WITNESS WHEREOF,** the undersigned has executed this Amendment on the 6th day of February, 2006, to be effective as provided herein.

Affiliated Computer Services, Inc.

By:　　　Lora J. Villarreal
Name:　　Lora J. Villarreal
Its:　　Sr. V.P. H.R.

12.　　Defendant The ACS Administrative Committee ("Committee") was one of the named fiduciaries of the Plan during the Class Period.  Members of The Committee were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A) in the each member exercised discretionary authority with respect to the management, administration, and disposition of Plan assets.  The Administrative Committee Charter of the Committee makes clear that The Committee had, and

---

[3]  See governing Plan document Article 8.10 entitled "Action By The Employer," which provides that "[w]henever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its [the Company's] legally constituted authority."  (ACS 00366).

exercised, discretionary authority over the investments of the Plan. Under the heading "Investment Powers," the Administrative Committee Charter imposed on the Committee the duty "to establish that the requirements of ERISA are satisfied with respect to Plan investments." (Investment Power A, at ACS 00579). Indeed, the Administrative Committee Charter refers to the Committee as the Plan's "principal ERISA fiduciary" and provides that the Committee was to establish the Plans "investment policy and monitor [] investment performance." (ACS 00589).

13.     Defendant Lora Villarreal was a member of the Committee during times relevant to this Complaint. Defendant Villarreal signed the Form 11-K of the Plan for the fiscal year ended December 31, 2004, filed with the SEC on or about June 24, 2005, as follows:

**ACS SAVINGS PLAN**

By:     Affiliated Computer Services, Inc.
        Plan Administrator

By      /s/Lora Villarreal
Name: Lora Villarreal
Title:  Senior Vice President and Chief People Officer;
        Administrative Committee Member

14.     Defendant Kellar Nevill ("Neville") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Nevill).

15.     Defendant Gladys Mitchell ("Mitchell") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Mitchell).

16.     Defendant Meg Cino ("Cino") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Cino).

17. Defendant Mike Miller ("Miller") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Miller).

18. Defendant John Crysler ("Crysler") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Crysler).

19. Defendant Van Johnson ("Johnson") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Johnson).

20. Defendant Scott Bell ("Bell") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Bell).

21. Defendant Anne Meli ("Meli") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Meli).

22. Defendant David Lotocki ("Lotocki") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Lotocki).

23. Defendant Randall Booth ("Booth") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Booth).

24. Defendant Pam Trutna ("Trutna") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Trutna).

25. Defendant Brett Jakovac ("Jakovac") was a member of the Committee and a fiduciary of the Plan during times relevant to this Complaint (see, for example, ACS 00070, listing "voting members" of the Committee as of October 19, 2004 and including defendant Jakovac).

26. Defendant Jeffrey A. Rich ("Rich") was Chief Executive Officer and a member of the Board of Directors until his resignation which became effective on September 29, 2005. Defendant Rich personally benefitted from the back-dated stock option grants described herein.

27. Defendant Mark A. King ("King") is the President and Chief Executive Officer of the Company. Defendant King personally benefitted from the back-dated stock option grants described herein.

28. Defendant Darwin Deason ("Deason") has been the Chairman of the Board of Directors of the Company at times relevant to this Complaint. He served as Chief Executive Officer of the Company from 1988 until 1999 and was a member of the Compensation Committee of the Board of Directors from 1996 to 2003. Like Defendants Rich and King, between 1998 and 2002 Defendant Deason received stock option grants at or near the lowest annual stock price for such years and typically immediately before a substantial run-up in the Company's stock price.

29. As a member of the Board of Directors and, at times, a member of the Board's Compensation Committee, Defendant Deason was responsible for approving the senior executive stock option grants to Defendants Rich and King. The Compensation Committee (according to its Charter as restated on February 3, 2004) had the responsibility to "review and approve the…stock options…of the Chief Executive Officer and President and Chief Operating Officer." On or about May 11, 2006, as alleged hereinafter, the Wall Street Journal reported that it was standard practice of the Compensation Committee of the ACS Board to approve effective dates for executive options at ACS which generally preceded the date on which all members of the Compensation Committee

had signed off. Deason reviewed and approved the Company's stock option practices at issue in this case.

30.     Defendant Joseph P. O'Neill ("O'Neill") served as Chairman of the Compensation Committee of the Board of Directors of the Company during part of the Class Period. The Compensation Committee (according to its Charter as restated on February 3, 2004) had the responsibility to "review and approve the…stock options…of the Chief Executive Officer and President and Chief Operating Officer." Defendant O'Neill reviewed and approved the Company's stock option practices at issue in this case.

31.     Defendant J. Livingston Kosberg ("Kosberg") was a member of the Compensation Committee of the Board of Directors of the Company during the Class Period. The Compensation Committee (according to its Charter as restated on February 3, 2004) had the responsibility to "review and approve the…stock options…of the Chief Executive Officer and President and Chief Operating Officer." Defendant Kosberg reviewed and approved the Company's stock option practices at issue in this case.

32.     Defendants Villarreal, Nevill, Mitchell, Cino, Miller, Crysler, Johnson, Bell, Meli, Lotocki, Booth, Trutna, Jakovac, Rich, King, Deason, O'Neill, and Kosberg are hereinafter referred to as the "Individual Defendants."

33.     Each of the Individual Defendants has a *de facto* fiduciary of the Plan as a result of their discretionary authority or control over the Plan under the very broad definition of "fiduciary" set forth in ERISA at "3(21)(A), 29 U.S.C." 1002(21)(A). A person or entity is a fiduciary even if the Plan does not name him as such or by its terms assign fiduciary duties to him where, by his conduct, he engages in fiduciary activities. Those who have discretion over management of the Plan or the Plan's assets are fiduciaries regardless of the labels or duties assigned to them by the language

of the Plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action in part as a class action pursuant to Rules 23(a) and (b)(1) and (3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all Participants in the Plan for whose individual accounts the Plan purchased and/or held shares of ACS common stock (whether in the form of shares of common stock or units of the ACS Stock Fund) at any time during the Class Period (i.e., between December 31, 1998 and the present).

35.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the Class in that ACS' public statements represent that it had approximately 52,000 employees during the Class Period, and a substantial number of these employees were Participants in the Plan for whose account the Plan held ACS common stock in the form of ACS Stock Fund.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether defendants were fiduciaries of the Plan and/or the Participants;

b.    whether defendants breached their fiduciary duties;

c.    whether the Plan and the Participants were injured by such breaches; and

d.    whether the Class is entitled to damages and injunctive relief.

37.    Plaintiff's claims are typical of the claims of the members of the Class, as Plaintiff and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

38.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent counsel.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.    Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

40.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

41.    The Plan is an employee benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A).

42.    The Plan is a "defined contribution" or "individual account" Plan with the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participants account,

and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's accounts. Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.

43.    The Plan is a voluntary contribution Plan whereby Participants direct the Plan to purchase investments from among the investment options available in the Plan and allocate them to Participants' individual accounts.

44.    During the Class Period, one of the investment options available to Participants was the ACS Stock Fund. The governing Plan document (Article 4.13(a), at ACS 00347) describes the ACS Stock Fund as follows:

> The ACS Stock Fund consists primarily of Affiliated Computer Services, Inc. Class A common stock. The ACS Stock Fund also includes cash o r short-term liquid investments in amounts designed to satisfy daily Participant exchange or withdrawal requests. A Participant's interest in the ACS Stock Fund will be denominated as "units." Shares of Company stock held in the ACS Stock Fund and dividends and other distributions on Company stock shall not be specifically allocated to Participants' accounts. The value of a unit will fluctuate based upon various factors, including the market value of and dividends paid on Company stock, earnings and losses on cash or cash equivalent investments held in the ACS Stock Fund, ACS Stock Fund expenses and Plan administration expenses allocated to the ACS Stock Fund.

45.    While the governing Plan document describes the Plan investment known as the ACS Stock Fund, there was no requirement in the Plan that the ACS Stock Fund be offered to Participants as an investment option under the Plan and there was no requirement in the Plan that Plan assets be held or invested in the ACS Stock Fund. Indeed, to the contrary, the governing Plan document, consistent with ERISA, provided that, even if Participants designated the ACS Stock Fund as their chosen Plan investment, the Company could refuse the Participants' instructions and not invest the Participants' retirement savings in the ACS Stock Fund. Article 4.12(e) of the governing Plan document states:

> Notwithstanding any other provision of the Plan to the contrary, the Administrator shall have the authority to decline investment instructions of Participants or Beneficiaries where it deems appropriate and may exercise this authority if it

believes it would be imprudent not to do so in fulfilling its fiduciary role under ERISA.

46.    The governing Plan document thus provided the fiduciaries of the Plan - - - the Defendants in this case - - - with the express authority to reject Participant instructions to invest their retirement savings in the ACS Stock Fund.  More significantly, the fiduciary duties imposed upon Defendants by ERISA *required* that Defendants refuse to allow the investment of Plan assets  in the ACS Stock Fund during the Class Period in this case.  As alleged herein, the impermissible and unlawful backdating of executive stock options at ACS has exposed the Company to regulatory investigations, civil litigation, tax liabilities in amounts not yet computed or assessed, adverse publicity and the loss of investor confidence in the Company's senior management and Board of Directors.  Due to these consequences of the impermissible backdating of executive stock options at ACS, the value of ACS common stock, including as a component of units of the ACS Stock Fund, has been substantially diminished.

47.    Notwithstanding the fact that the fiduciary duties imposed by ERISA required the Plan's fiduciaries to prohibit investment of capital Plan assets in the ACS Stock Fund during the Class Period, the Plan maintained large holdings of the ACS Stock Fund.  For example, the Plan's 2004 Form 11-K represents, among other things:

> The Plan is a defined contribution plan wherein participants elect to reduce their compensation and have such reductions contributed to the Plan on their behalf. Generally, the Plan covers all eligible employees of the Company who elect to participate except those who are leased or are nonresident aliens not receiving United States source income.  The Plan also allows for rollovers from other plans.

> Participating employees may contribute up to the lesser of 18% (30% for employees of ACS Health Administration, Inc. hired prior to April 1, 2003) of covered compensation through payroll deductions or the maximum amount permitted under applicable Internal Revenue Service provisions.  The Company may make a discretionary matching contribution each pay period to the Plan based on a percentage of the participant's compensation and Company profitability as decided by the Company's Board of Directors.

> * * *

Company matching contributions are made to the ACS Stock Fund. Participants may exchange out of the ACS Stock Fund at any time with no restrictions.

* * *

The Plan maintains the following investments representing 5% or more of the net assets available for benefits at December 31, 2004 and 2003:

|  | 2004 | 2003 |
|---|---|---|
| Fidelity Growth Company Fund | $58,469,211 | $37,498,736 |
| Fidelity Low-Priced Stock Fund | 46,867,705 | 29,305,865 |
| Fidelity Money Market Trust Retirement | 88,254,225 | 68,983,696 |
| Fidelity Spartan US Equity Index Fund | 36,609,675 | 22,400,042 |
| ACS Stock Fund | 49,631,131 | 37,279,579 |

48.     Since the 2004 Form 11-K represents that the net assets available for benefits at December 31, 2004 and December 31, 2003 were $458,185,809 and $309,387,966, respectively, at year-end 2004 approximately 11% of the Plan's assets were invested in ACS common stock fund and at year-end 2003 approximately 12% of the Plan's assets were invested in ACS common stock. However, as alleged herein, ACS common stock was not a prudent retirement investment under the Plan during the class period, including at year-end 2004 and year-end 2003, because of the serious, then–undisclosed improprieties engaged by the Company and the Individual Defendants with respect to the back-dating executives stock options.

## DEFENDANTS WERE FIDUCIARIES OF THE PLAN

49.     ACS is the named Sponsor of the Plan within the meaning of ERISA §3(16)(B), 29 U.S.C. §1002(16)(B). The Committee is a or the named Plan fiduciary and thus a Plan fiduciary. Each of the Individual Defendants was either named or *de facto* fiduciaries of the Plan as the result of discretionary authority and control which these persons had over the management and administrator of the Plan and the assets of the Plan.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

50.     Pursuant to ERISA § 404, fiduciaries have a duty to discharge their duties with respect to the Plan prudently and solely in the interest of Participants and Beneficiaries and for the

exclusive purpose of providing benefits to Participants and their Beneficiaries. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable and proper option for the Plan. The selection, monitoring and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties.

51.     Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), the Plan's fiduciaries had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like character and of like aims, and to diversify investment in the Plan so as to minimize the risk of large losses.

52.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

53.     Companies typically provide two types of pensions Plan: (a) a "defined benefit" plan where the amount of an employee's retirement benefit is a direct obligation of the company which is a set amount (typically based on salary while employed and number of year of employment); and (b) a "defined contribution" plan, such as a 401(k) plan, where the retirement benefit is based solely on the amount invested and the earnings made in an employee's plan account. Fiduciaries of defined benefit Plan, who invest or actively supervise the investment of plan assets, are liable under ERISA for imprudent investments made by the plan, and they are liable for and must make good to the plan any losses suffered by the plan and any loss of benefits suffered by beneficiaries as a result of imprudent investments. Fiduciaries of defined contribution Plan are similarly liable under ERISA

§ 404(a), 29 U.S.C. §1104(a), for imprudent investments made by a plan, even where the investment choice is selected by the participant, unless the plan and the fiduciaries comply with the strict requirements of ERISA § 404(c), 29 U.S.C. §1104(c). Where the plan and fiduciaries do not comply with section 404(c), then the fiduciaries' liability for imprudent investments is the same as the liability of a fiduciary of a traditional pension plan.

54. Fiduciaries can shift liability for imprudent investments to fiduciaries under Section 404c if, among other things, they meet four specific requirements:

    a.    they disclose in advance the intent to shift liability to Participants;

    b.    they ensure that Participants are not subject to undue influence;

    c.    they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law. In this regard, fiduciaries have a choice B they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

55. Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c)in that; (i) they failed to disclose in a fiduciary capacity all material information that they were not precluded from disclosing under other applicable law and which was necessary for Participants to make informed investment decisions; (ii) they failed to provide an adequate description of the investment objectives and risk and return characteristics of the Funds; and (iii)

they failed to ensure that Participants were not subject to undue influence, and indeed themselves subjected Participants to undue influence.

56. The governing Plan document, moreover, makes clear that the fiduciaries of the Plan had discretionary authority to refuse to invest the Participants' retirement savings in the ACS Stock Fund, including if they "believe[d] it would be imprudent not to do so in fulfilling [their] fiduciary role under ERISA." (Article 4.12(e) at ACS 00347). The improper and unlawful backdating of executive stock options at ACS has, foreseeably, caused such damage to the Company and such a diminution in the value of ACS common stock (including ACS common stock as a component of units of the ACS Stock Fund) that the Defendants in this case were not only authorized to refuse Participant directions to invest in the ACS Stock Fund, they were required to so refuse by the duties of prudence and loyalty and other obligations imposed by ERISA.

57. That Defendants could have refused Participant directions to invest in Company stock is not only clear from the governing Plan document (Article 4.12(e) at ACS 00347, discussed above) but from communications to Participants. One such communication, a letter addressed "Dear ACS Associate" by Defendant Villarreal (ACS 00869, at 00878), noted that Participant directions to sell the ACS Stock Fund might be delayed or "suspended" under certain circumstances, and further, that "[i]n unusual circumstances, the [f]und [the ACS Stock Fund] may be closed to purchases or sales". The Defendant fiduciaries of the Plan thus had ample discretion to divert Participant directions to purchase the ACS Stock Fund into other, more suitable investments, and under the circumstances of this case, involving senior management and other improprieties which substantially devalued the ACS Stock Fund, had the duty to so diversify Participants out of the ACS Stock Fund. Defendants failed to properly diversify Participants out of the ACS Stock Funds as permitted by the Plan and as required by ERISA.

## SUBSTANTIVE ALLEGATIONS

58.     A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price (referred to as the "exercise price") for a specified period of time.  Stock options are granted as part of employee compensation packages as a means to create incentives to boost profitability and stock value.

59.     When the employee exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised.  If the exercise price is lower than it should be, the employee pays less and the company gets less when the stock option is exercised.

60.     Between 1998 and at least year end 2002, ACS granted stock options for the purchase of hundreds of thousands of shares of the Company's common stock to Defendants Rich and King.

61.     In public filings with the Securities and Exchange Commission, including in shareholder-approved stock option plans and in certain employment agreements, ACS contracted and represented that the exercise price of all the stock options would be no less than the fair market value of ACS's common stock, as measured by the publicly traded closing price for ACS stock on the day of the grant.

62.     The only possible explanation for the strong correlation between the grant date of the options and the low share price of ACS stock is that the exercise price for the options granted the Individual Defendants was determined after the fact and keyed to a day on or near the day when ACS stock hit its low price for the year, or directly in advance of sharp increases in the price of ACS stock.  As such, the date upon which the Options were granted was determined in a fashion designed to ensure that the Defendants Rich and King were able to profit off the fluctuations in ACS stock, with the benefit of hindsight.

63.     Any other explanation is statistically impossible, as revealed by the <u>Wall Street Journal</u> in a series of articles in March 2006 and thereafter, which revelations have led to regulatory scrutiny of many companies' executives stock options practices and, as noted above, subpoenas to various companies, including ACS, with respect to its practices.

64.     ACS's repeated representations to the public that the exercise price of all the stock options would be no less than the fair market value of ACS' common stock, measured by the publicly traded closing price for ACS stock on the day of the grant, were false.

65.     Defendants Rich and King profited handsomely from ACS's backdating of stock options.

66.     The practice of backdating stock options not only enriched Defendants Rich and King, but also resulted in the overstatement of ACS's profits between 1998 and 2002.  This is because options priced below the stock's fair market value when they are awarded bring the recipient an instant paper gain.  Under accounting rules, that is the equivalent of additional compensation and must be treated as a cost to the company.

67.     Moreover, ACS may owe large amounts in back taxes to the Internal Revenue Service.  Tax rules allow companies to deduct from their corporate filings executives' gains from exercised stocks, because the IRS views the option profit as comparable to extra compensation paid to employees.  However, that only applies to options granted at the price on the day it was issued, or the day before. Options backdated to a day with a lower market price do not qualify for a deduction of gains from the CEO or the next four highest-compensated executives.

68.     ACS did not account for the amount by which the market price of ACS stock exceeded the exercise price of the options.  Thus, the practice of backdating options caused ACS to overstate its profits.

69. Throughout the Class Period, Defendants issued communications to the Participants (either directly or indirectly through statements in SEC filings which was incorporated into communications to Participants) which failed to inform the Participants about the back-dating of the stock option grants to senior executives and the other improper, inappropriate and unlawful conduct alleged herein. These false and misleading communications to the Participants included the Company's 2004 Form 10-K Annual Report which stated, under the heading "Stock-Based Compensation Plans," that "[u]nder our 1997 Stock Incentive Plan (the "1997 Plan"), we have reserved approximately 7.4 million shares of Class A common stock for issuance to key employees at exercise prices determined by the Board of Directors… Generally, the options for each plan…are issued at exercise prices no less than 100% of the market value of our Class A common stock at the time of the grant." Similarly, the Company's 1995 Form 10-K, which was among the SEC filings which the SPDs encouraged Participants to review in making their investment allocations, represented that the Company's executive stock options "are issued at exercise prices no less than 100% of the fair market value of our Class A common stock at the time of the grant." (2005 Form 10-K, Note 12 ("Stock-Based Compensation Plans")).

**THE TRUTH BEGINS TO BE REVEALED**

70. On March 18, 2006, The Wall Street Journal published an article discussing the curious timing of certain stock option grants to senior executives of a number of companies, including ACS. According to that article, option grants to Defendant Rich between 1998 and mid-2002 were consistently dated on the day that the Company's stock price either hit its low price for the year or in advance of sharp stock price increases. The article stated that the statistical odds of such an occurrence happening randomly were at least one in three hundred billion, strongly suggested that the Rich grants had been back-dated.

71. On April 28, 2006, <u>The Wall Street Journal</u> reported, in a story entitled "ACS Addresses Grant Practices On Stock Options":

> **Affiliated Computer Services Inc.** said it doesn't "believe" any "intentional granting of look-back stock options" to executive officers and directors occurred, but the company said it sometimes pegged grants to coincide with points when its stock price was at relatively low levels.
>
> It was unclear what the Dallas company meant by look-back stock options, or whether the phrase is synonymous with options "backdating", a practice that is the subject of a broad Securities and Exchange Commission inquiry. An ACS official made the comments yesterday on the company's quarterly earnings conference call.
>
> ACS previously said it is the subject of an informal SEC inquiry. During the conference call, the company said it had retained outside legal counsel to lead an independent probe. A company spokeswoman didn't return a call.
>
> Options, a common form of executive compensation, give holders the right to buy shares at a fixed, or exercise, price. If the market price of the shares rises above the exercise price, the holders can profit by cashing out the options. The SEC is trying to determine whether some companies backdated options to secure lower exercise prices, giving executives a better chance to profit.
>
> Last month, <u>The Wall Street Journal</u> raised questions about the timing of grants to former ACS Chief Executive Officer Jeffrey Rich in an article that also looked at irregular grant patterns at several other companies.
> All six of Mr. Rich's stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop. While most of Mr. Rich's stock-option gains were because of rises in ACS stock, the timing of grants enhanced his take."

72. On May 11, 2006, the <u>Wall Street Journal</u> reported, in a story entitled "ACS Says Some Options Carried Dates that Preceded Approvals."

> **Affiliated Computer Services Inc.** acknowledged that it issued executive stock options that carried "effective dates" preceding the written approval of the grants, saying it plans a change of as much as $40 million to rectify its accounting related to the grants.
>
> The announcement followed a preliminary internal probe at ACS, a Dallas technology outsourcer that is also under scrutiny by the Securities and Exchange Commission for its options practices. Between 1995 and 2002, the company granted stock options to Jeffrey Rich, its chief executive for part of that time, that were routinely dated just before sharp run-ups in the company's share price, and often at the nadir of big dips.

Mr. Rich left the company last year. A rising share price helped him reap more than $60 million from options during his tenure at the company. The timing of his grants helped, too. If his six grants had come at the stock's average closing price during the year they were dated, he'd have made about 15% less.

One particularly favorable grant to Mr. Rich was dated July 23, 2002, the day the stock sank to its lowest level in a year; it turned around and started to head up the next day. Other grants also fell during stock-price dips. ACS's statement didn't explain how such beneficial timing happened to occur year in and year out.

The pattern raised questions about whether the grants were backdated or otherwise timed to take advantage of the favorable prices. Executive option grants usually carry a "strike price" equal to the market value on the day they are granted by the company's board. If the stock rises above the strike price, the executive can cash in the option for a profit.

In a securities filing yesterday notifying the SEC that it would delay its quarterly report, ACS sketched out a "historical practice" for approving option grants to top executives that is unusual. The company said the compensation committee of its board of directors, which is responsible for granting options, would approve them through written consent, with "effective dates" that "generally preceded the date" on which all members of the committee had signed off.

The company's chairman, Darwin Deason, would "engage, on a relatively contemporaneous basis with the effective date" in phone calls with the committee members, to seek their verbal approval. ACS said in the filing that it believes such a practice is "permitted" under its stock-option plans and state law.

ACS said its accounting firm, though, determined that the award date "cannot precede" the date of the written consent or of a "valid" compensation-committee meeting. The company didn't say whether the charge would trigger a restatement, and it stressed that the results of the review were only preliminary. In its filing, ACS said it "does not believe that any director or officer" of ACS has "engaged in the intentional backdating of stock-option grants in order to achieve a more advantageous exercise price."

A Wall Street Journal article in March described the patterns of grants to Mr. Rich between 1995 and 2002 and found that the likelihood of the pattern occurring at random was statistically infinitesimal. Mr. Deason received some grants carrying the same favorable dates as Mr. Rich, as did current CEO Mark King."

73.     Thereafter, on May 18, 2006 TheStreet.com reported:

The U.S. District Court for the Southern District of New York requested that ACS hand over documents related to stock options granted from 1998 to the present.

Shares of the IT services firm slipped 2.3% , or $1.21 to $51.72, in midday trading.

74.  The <u>Wall Street Journal</u> reported on August 7, 2006 as follows:

**ACS Retreats From Claims That Backdating Review Found Only Minor Issues**

> **Affiliated Computer Services Inc.,** backing away from assertions that its stock-options problems were minor, is expected to announce today that investors should no longer rely on its prior disclosures about the findings of a continuing internal probe into the matter.

> Such an announcement would be a retreat for the Dallas technology out-sourcing firm, which previously sought to play down suggestions it had backdated stock options for the benefit of top executives.  In a May filing with the Securities and Exchange Commission, the company said a preliminary review suggested no intentional backdating occurred and that any related accounting charges were likely to be minor.

> A spokesman, Michael Buckley, confirmed the expected warning to investors, but declined to say whether the company has found concrete evidence of wrongdoing or to quantify the anticipated size of any charges or restatements.  ACS will provide more-detailed information when its review is complete in September, Mr. Buckley added.

> ACS previously stressed that the internal probe was continuing and incomplete.

> ****

> ACS is among more than 80 companies being examined by federal authorities; the focus of the probes is whether grants were improperly or illegal back-dated so that they would carry the beneficial dates.

> Mr. King, the CEO told investors in an April conference call that based on the company's review, "we do not believe that there has been any intentional granting of look-back stock options to executive officers and directors."  He explained the fortuitousness by saying the compensation committee has "not been opposed" to granting options when the share price "appeared low."  He added:  "This appears to be a procedural matter that will get sorted out in the next couple of months."

> The next month, ACS said the review had found the company did make grants with "effective dates" that "generally preceded the date" on which all members of the committee had signed off on them.  It said it would likely take an accounting charge estimated at $21 million.  ACS repeated that it didn't believe directors or officers had intentionally back-dated grants, but described an unusual granting process by which Mr. Deason would call up committee members and suggest that grants be made.

> The probe is being conducted under the direction of the board, and is being monitored by ACS's audit committee.  Three law firms are assisting with the probe, the spokesman said.

75.     Thereafter, on August 11, 2006, <u>The Wall Street Journal</u> reported in a lengthy expose about the backdating of executive stock options at, among other companies, ACS:

> At Affiliated Computer Services, Inc., a technology outsourcer in Dallas, the board is probing a pattern of unusually well-timed options grants to former Chief Executive Jeffrey Rich and others. The grants allowed Mr. Rich to earn millions of dollars in profits. His grants often were dated just ahead of steep rises in the company's stock. A March analysis by The Wall Street Journal found that the likelihood of such propitious grant dates occurring by chance was approximately one in 300 billion. The grants are under scrutiny by federal authorities as well.
>
> Whereas many companies mounting an internal probe ask a small committee of independent directors to oversee it, ACS has put its entire seven-member board in charge of the process, assisted by outside legal counsel. So the oversight group includes board Chairman Darwin Deason. Mr. Deason both received some of the options in question and had a role in their timing, the company has said. ACS says its four member audit committee also is monitoring the situation.
>
> Of the six other directors overseeing the probe, two received some of the well-timed options in question. Two others, who are outside, independent directors, were on the compensation committee that approved grants. The remaining two directors, also independent, are men with whom Mr. Deason has had various past ties.
>
> One is J. Livingston Kosberg. He and Mr. Deason go way back. In the late 1980s, the two were entangled in the collapse of a Texas savings-and-loan institution of which Mr. Kosberg was chairman. In winding up the matter, ACS paid a fine and Mr. Kosberg also paid money to federal regulators. Neither was charged with wrongdoing.
>
> In 1998, Mr. Kosberg joined the board of a company that ACS spun off, Precept Business Services Inc. Mr. Deason was the controlling shareholder of Precept and Mr. Kosberg served on its compensation and audit committees.
>
> Precept filed for bankruptcy protection in 2001. In a lawsuit in federal bankruptcy court in Dallas, a bankruptcy trustee criticized Precept directors for allowing Mr. Deason and relatives of his to–as the trustee put it–"systematically loot" the company. The suit, singling out Mr. Kosberg and other directors for particular criticism, alleged that the publicly held company had picked up the tab for a range of Deason-family personal expenses, from country-club memberships and luxury cards to cosmetic surgeries, maids, bodyguards, dry cleaning and limousine service.
>
> Both Mr. Deason and Mr. Kosberg settled with the trustee, Mr. Deason for more than $3 million. He didn't return a call seeking comment. An ACS spokesman said that Mr. Deason continues to deny the trustee's looting allegations and that Mr. Deason personally guaranteed more than $2 million in Precept loans and ultimately bore their cost.

Mr. Kosberg, in an interview, said the Precept board functioned well and "there was no looting." As for the S&L collapse, Mr. Kosberg said he didn't remember the details. "We all walked the plank," he said. He said his relationship with Mr. Deason over the years has been "pure business" and sometimes "strained."

Mr. Kosberg said the ACS board would sort out the stock-options issues: "I know what an independent board is and what a crony board is, and I'm confident that this is an independent board that has the willingness and ability to turn over every rock." He said he is confident in the company's integrity and believes regulators probing for any wrongdoing will "come up empty."

The seventh director of ACS, Dennis McCuistion, a professional speaker, consultant and television producer, also has longstanding ties to ACS and Mr. Deason. ACS invested $25,000 in a partnership Mr. McCuistion set up to produce a TV show in the late 1980s, said people familiar with the situation, and Mr. Deason later was on the board of a nonprofit television company started by the director. Mr. McCuistion also consulted for one of Mr. Deason's earlier companies, but the people familiar with the matter said any business involvement between the two men ended 17 years ago.

ACS, after being asked by The Wall Street Journal in January about its past options grants, initially said there were no problems. The board later launched its internal probe, calling on its longtime outside legal counsel Baker Botts LLP, to lead the effort.

In May, the company reported some preliminary findings: While some options grants may have been given incorrect dates, no officer or director had engaged in any intentional backdating, and any accounting adjustments were likely to be minor.

Earlier this week, ACS backtracked from that statement, too, saying investors shouldn't rely on its disclosures about the preliminary findings. ACS said it had hired two more outside law firms to help with the probe.

A company spokesman said ACS has directed lawyers to "do whatever is necessary to objectively reach all the facts." The spokesman said all of the independent directors meet the New York Stock Exchange standards for independence, and added: To suggest that the investigation will be anything other than thorough and objective would be inaccurate and grossly unfair."

76. Thereafter, on October 28, 2006, the Wall Street Journal reported, in substance, that the "internal probe" at ACS of the alleged backdating of executive stock options at the Company was being deemed insufficient by regulators. That article reported, among things:

In at least one case, federal officials have stepped in when they felt an internal probe wasn't getting to the bottom of the matter, according to a person familiar with the circumstances. At Affiliated Computer Services Inc., a Dallas-based technology

26

outsourcing company, executives benefitted from a tremendously unlikely pattern of timing grants. A Wall Street Journal analysis last March put the odds at 300 billion to one that the dates on which grants purportedly had been awarded to the company's former CEO was chosen randomly. The company used its longtime outside counsel to conduct the probe.

In May, the company announced a preliminary finding that there was no intentional backdating to enrich executives. Government officials prodded ACS to look harder, and the company hired a new team of lawyers with no connection to the firm. From day one ACS has expected its legal counsel to leave no stone unturned and conduct a thorough, objective, and complete investigation of all the facts and that is exactly what is occurring," said spokesman Michael Buckley.

77.     Thereafter, on November 17, 2006, the <u>Wall Street Journal</u> reported, in substance, that the alleged backdating of executive stock options padded CEO pay by an average of 10% at the companies studied in the article (neither specifically including, nor specifically excluding, ACS). That article reported, among things:

About 850 U.S. chief executives received backdated or otherwise manipulated their stock option grants that boosted their annual pay, on average, by at least 10%, according to a new study.

The study, released yesterday by professors at Harvard and Cornell universities and the French business school Insead, bolsters the view of federal prosecutors who have viewed stock-option backdating as means to steal money from shareholders. Defendants of the companies who engaged in the practice have said that backdating often involved minor sums and was merely an alternative way of providing market-based pay.

The study, a paper done for the Harvard Law School Program on Corporate Governance, didn't name executives or companies that may have backdated. It relied on broad statistical analyses that identified suspiciously "lucky" patterns of options granted at low prices.

The researchers also found that executives who repeated riches from backdating options started out with reported compensation that was richer than their peers at similar companies. On top of that above-average pay, executives received an average of an extra $1.3 million to $1.7 million through each manipulated grant, the academics found.

"It's not pocket change," said Lucian Bebchuk, a professor of law, economics and finance at Harvard and one of the study's authors.

78. Based on the foregoing, ACS has emerged as one of the principal offenders in the area of the backdating of executive stock option grants in what has become a scandal of nationwide proportions. No less than President Bush recently criticized the backdating of executive stock options generally, opining that "[O]vercompensating or trying to **backdate things** is ... **bad for America**. And there ought to be consequences when people don't tell the truth and are not transparent." Similarly, former SEC Chairman Arthur Levitt has described the backdating of executive stock options generally as "ripping off shareholders" and as the "ultimate in greed."

## RESULTING LOSSES TO THE PLAN

79. As a result of the foregoing, the Plan has suffered substantial losses and the retirement savings of the Participants have been greatly diminished. That the market price of ACS common stock dropped by about $5 per share, or about 10%, when the Wall Street Journal published its article about the backdating of executive stock options at ACS in April 2006 is no coincidence but, rather, demonstrates that the unlawful activities alleged herein (and summarized by the Wall Street Journal), have resulted in a substantial diminution in the value of ACS common stock and in the value of the ACS Stock Fund held in the Plan accounts of Participants. Had Defendants not engaged in the breaches of fiduciary duty alleged herein, Participants' accounts would not have suffered loss from the diminution in value of ACS common stock, and Participants would have substantially increased their retirement savings by investing in other, better performing investment alternatives.

## CLAIM I

## DEFENDANTS NEGLIGENTLY MISREPRESENTED AND NEGLIGENTLY FAILED TO DISCLOSE MATERIAL INFORMATION

80. The allegations of all paragraphs set forth above are specifically realleged and incorporated herein by reference.

81.     Pursuant to ERISA § 404, 29 U.S.C. '1104, defendants have a duty to discharge their duties with respect to the Plan prudently and solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries.  The duty of the fiduciary includes at least:

a.      a duty not to misinform;

b.      a duty to inform when the fiduciary knows or should know that silence might be harmful; and

c.      a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

82.     Defendants made repeated misrepresentations and concealed material information as set forth above.

83.     Participants in the Plan, relied upon, and are presumed to have relied upon, defendants' misrepresentations and non-disclosures to their detriment.

84.     As a consequence of defendants' misrepresentations and non-disclosures, the Plan suffered losses.

85.     Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

86.     Each defendant is jointly liable for the acts of the other defendants as a co-fiduciary.

87.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

## CLAIM II

### DEFENDANTS NEGLIGENTLY MISREPRESENTED AND NEGLIGENTLY FAILED TO DISCLOSE MATERIAL INFORMATION

88.     The allegations of all paragraphs set forth above are specifically realleged and incorporated herein by reference.

89. Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c), so defendants remained liable for all imprudent investments in ACS stock offered in the Plan.

90. Defendants breached their fiduciary duties as alleged above by allowing the Plan to purchase and hold ACS stock during the Class Period, and by allowing the ACS stock to remain an investment option under the Plan, because this investment in ACS stock was an imprudent investment for Plan whose purpose was to provide for employee retirement income security.

91. At all relevant times, defendants were aware or should have been aware of the publicly disclosed misrepresentations, which knowledge would have led a reasonable investment manager to conclude that an investment in ACS stock was an imprudent, high risk investment for the Participants in the Plan, whose purpose was to provide for employee retirement income security. In particular, defendants should have known that the Company was systematically back-dating stock option grants of senior management, thereby raising serious issues about the integrity and competence of senior management, legal compliance by the Company and senior management and distorting the Company's financial and operating conditions.

92. Defendants also have known (a) that defendants made the negligent misrepresentations directly to Plan Participants as set forth above; (b) these facts that were negligently never disclosed in a timely manner; and (c) that these negligent misrepresentations and non-disclosures would have a negative effect on the price of ACS common stock and caused the stock to be an imprudent investment.

93. Based on the foregoing, Defendants should have terminated the ACS Stock Fund as an investment option under the Plan or, in the alternative, should have informed, allowed or directed the Participants to diversify out of employer stock to protect their retirement assets.

94. To the extent that the defendants possessed material adverse non-public information, they should have prevented the Participants from purchasing additional ACS common stock. They should also have directed the Plan to sell all ACS common stock and disclosed this non-public information prior to any sales by the Plan. Had it done so, the Plan would have limited their losses substantially, even though the price might have dropped upon disclosure.

95. Defendants were fiduciaries who breached their fiduciary duties in that they should have known the facts as alleged above and should have known that the Plan should not have permitted the investment in ACS common stock.

96. As a consequence of the Defendants' breaches, the Participants suffered losses.

97. The Defendants are liable to personally make good to the Participant any losses to the Plan resulting from each breach.

98. Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

99. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## CLAIM III

### THE FAILURE TO MONITOR THE COMMITTEE AND ITS MEMBERS
### (AS AGAINST DEFENDANTS RICH, KING, DEASON, O'NEILL AND KOSBERG)

100. The allegations of all paragraphs set forth above are specifically reallege and incorporated herein by reference.

101. As alleged above, the Defendants Rich, King, Deason, O'Neill and Kosberg were members of the Board of Directors of the Company, in some instances and at certain times, members of the Compensation Committee of the Board which was responsible for executive compensation, and in some instances recipients of the backdated executive stock option grants alleged in this Complaint. All of the Defendants named in this Claim were fiduciaries within the mean of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

31

102.    As alleged above, the scope of the fiduciary responsibility of these Defendants included the responsibility to appoint, evaluate, and monitor the Committee and its members.

103.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, the Director Defendants had the duty to:

>    (a)    Ensure that the monitored fiduciaries (the COmmittee and its members) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

>    (b)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

>    (c)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

>    (d)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

>    (e)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

>    (f)    Ensure that the monitored fiduciaries report regularly to the Company.  The Company Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

104.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of the plan

assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

105.     The Defendants named in this Claim breached their fiduciary monitoring duties by, among other things,

(a)     failing to ensure that the Committee had access to knowledge about ACS's improper back-dating of senior executives stock options alleged above, which made ACS common stock an imprudent retirement investment, and

(b)     failing to ensure that the Committee completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in ACS common stock, an investment that was imprudent and subject to inevitable and significant depreciation. They knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering the ACS Stock Fund as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Plan in ACS common stock when it no longer was prudent to do so. Despite this knowledge, they failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

106.     The Defendants named in this Claim, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the back-dating of senior executives stock options at ACS which they knew or should have known that these defendants needed to make sufficiently informed decisions. By remaining silent and

continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

107.    These Defendants are liable as co-fiduciaries because they knowingly participated in each others fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

108.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, suffered losses in their retirement investments.

109.    Pursuant to ERISA § 502(a) 29 U.S.C. §1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Claim are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(b), 29 U.S.C. § 1104(c)(1)(b);

C.    An order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan's all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition a constructive trust on any amounts by which any Defendant was unjustly

enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in ACS stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of the Company;

H.      An order awarding costs pursuant to 29 U.S.C. §1132(g);

I.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An order for equitable restitution and other appropriate equitable monetary relief against the Defendants.


Dated: New York, New York
       November 27, 2006         **STULL, STULL & BRODY**


         By:  /s/ Edwin J. Mills
         Edwin J. Mills (EM-7117)
         6 East 45th Street
         New York, New York 10017
         (212) 687-7230

         The Whitehead Law Firm
         C. Mark Whitehead, III, Esq.
         2 S. Magdeline Square  Suite 207
         Abbeville, LA  70510
         (337) 740-6006

         Attorneys for Plaintiff